If it pleases the Court, my name is Steve Stolle from Martins & Associates. I represent Kimberly and Craig Young on this appeal. I'd like to reserve four minutes of time for rebuttal. If it pleases the Court, the appeal largely turns on Rule 19A and whether the factors under that rule are submitted properly by the district court and established. I want to clarify that Regence's brief differs with our understanding of the standard of review here. The standard of review of the actual dismissal or whether to dismiss or not under Rule 19 is an abuse of discretion. But the underlying decisions about whether the particular elements of Rule 19 are met are either issues of law or mixed questions of fact and law. So I would submit that all those decisions by the district court are reviewed de novo by this Court. Well, certainly their finding of fact is not de novo, but how we apply the law to it may be. Yes, Your Honor. I also have a couple of additional authorities to note on the issue of under 19A1B and whether the absent party is the party who must affirmatively claim the interest in the litigation. I would note that Rule 24A2 has identical language and the federal rules need to be interpreted, similar language needs to be interpreted similarly so that it's consistent. And certainly under the intervention rule, the absent party who's trying to intervene must affirmatively claim for themselves. And so the identical language under Rule 19A1B should be interpreted that way. Also, on that same issue Well, is your position on that that all 20,000 preferred providers should try to intervene? Otherwise 20B, you know, subsection B isn't triggered? No, Judge Reimer, just at least one, at least one provider. That one provider could represent all. But your position is, just so I understand it, I don't know if it's correct or not, but your position is that at least one third party has got to seek intervention, not just, I mean, it has to go that far. No, Your Honor, that's not, I wouldn't go that far. What about a letter? Would a letter work? There would have to be evidence. I really don't like what the plaintiffs are seeking to do to me in this case. Would that work? If there were evidence of that in the record, I think that might be sufficient, Your Honor. But there is no evidence here of the providers claiming an interest. So you're saying that one can't read a contract, no matter how clear. And I agree with you, this one isn't perhaps as clear as others I can think of. But even if a contract were clear in conferring an interest on the third party, you can't just look at that. You've got to have that third party come in and take some kind of overt act to indicate its interest. Yes, Your Honor. Okay, thank you. And what case says that? I would cite also, it's not in our brief, but Inree Orange County. Because I've really looked for a case like that and I can't find it. Well, I didn't find that until very recently, I'm sorry to say, Your Honor. Will you submit a gum sheet on that, please? Yes.  Thank you, Your Honor. But Inree Orange County, the site is 262 F. 2nd, 1014. The pinpoint page is 1023. It's Ninth Circuit, 2001. And I would quote that this court held and stated that Orange County cannot claim that the districts, the absent parties, have a legally protected interest in the action unless the districts themselves claim that they have such an interest. So, that may be sufficient that they actually, there's something in the record where the absent parties indicated they have an interest. They could be writing a letter to regents and say, what's going on here? Are you representing me or what? Are you protecting these contracts or what are you going to do about it? There's just nothing like that in there. There's been purely regents stepping up and saying, well, these 22,000 providers in Washington who we do business with every day, they have this interest. We don't have any evidence that they've claimed it, but there is one, so therefore you should protect them, Your Honor, and dismiss this case because they're absent parties. Well, what your problem is is that if you really look at what's in there, it would seem as if they do have an interest. You're just suggesting, in fact, I was really, after reading your brief, I thought you really weren't arguing that they didn't have an interest. I mean, it seemed obvious they have an interest. The interest was the difference between the allowed amount and the billed amount. That's an interest. But that interest isn't provided for in their contracts. And how the claims are processed is Isn't that the very problem we're dealing with here, then, is really whether it's provided for in their contract or whether it isn't, and that's why they ought to be here to argue about that. Because they would suggest it does. I mean, it would seem to me, but I guess that's why I'd like to have them here. If they're willing to cave in and say it the way you want it, they don't need to be here. But that's what the district judge was saying. I'd like to have them here to say what their argument is, if they have one. Well, then he could have asked regents to provide him notice and see if anybody stepped up and claimed the interest. Frankly. Was that sought in the district court? We suggested it on reconsideration, and the court declined to consider that. Okay. Regardless of whether they have claimed it or not, they gave it up under the contracts anyway. Every conceivable means of setting rates, processing claims, everything in the provider agreement is determined by regents purely at its discretion. And the agreements, these aren't for any particular term. As the agreement itself provides, and I direct the court to evidence, the excerpt of record at page 455 where they have the terms and termination, quote, the parties agree they are contracting at will. And these, the contracts there govern how the parties interact with each other as far as billing and other things. But there's no particular protected interest in whether they remain providers or not. Either party can simply quit. You know, and that goes to the Eldridge case, which is directly on point to this. The Eldridge case really isn't like this one because in the Eldridge case, in this case the providers didn't cede their interest to the regents, Blue Shield, in this particular matter. And in the Eldridge case, frankly, those who you would say would be in a similar position had ceded their interest to the one that was in the case. But that didn't happen in this case. Providers have not ceded any interest whatsoever to anybody. I disagree, Your Honor. I think it's clear in their provider agreement that they cede all control over billing practices and the amounts, what the allowed amounts are. Everything is ceded to regents. Regents control how the claims are processed and what the amounts are. And if they change the contract with the subscriber, even if we were wrong about the interpretation of the subscriber agreement, regents could change that subscriber agreement to say what we say it says, even if it doesn't say that now, to provide that the subscribers to pay only the allowed amount at all times throughout the term of the contract, not just until the benefit is exhausted. And so it says that. And they start processing claims that way, and that's what the providers have to accept. That's the thing that they either accept it or they can quit. Even if the plan providers have, you know, ceded billing process, even billing rates, whatever, to Blue Cross regents. Oh, where have they ceded their own ability to charge RAC rates for non-covered benefits? They haven't, and that's where the confusion over what non-covered services. Well, that's the problem. It isn't that the nub here, because that's the only thing in which the plan providers have an interest. And they appear to me to have a pretty significant interest in what they can charge their own patients for non-covered services. And that's a fundamental error that the trial court made here in going along with Regents' position that these are non-covered services that are being billed. But the fact is these are covered services under the contract. The contract is a one-year contract, and they're covered services under that contract for the benefit to them exhausted or not. That's fine, but the argument would be that they're not covered once they're exhausted. That is, once you have – there's no question about the difference between 80 percent and 100 percent if it's a co-insurance thing. That's going to be on the negotiated lower rate. But if that is exhausted or the benefit threshold has been passed, then it's up to the provider and the patient to negotiate what the traffic will bear. And some providers are good guys and some aren't. Well, actual non-covered services, this case isn't about those, and it doesn't have any effect on what they charge for non-covered services. Okay, look, I'm trying to shorthand it. Otherwise, it would take, you know, 15 hours to answer my question. It's long-winded enough. When I'm using the word non-covered, I mean, you know, if you've got $400 worth of insurance and you have exhausted that, your insurance is paid $400, your 401th dollar is not covered. That's what I mean. And for that 401th dollar, the plan provider can either charge you a buck, can charge you $0.80, it can charge you $0.10, or it could charge you $15, however nasty they want to be, right? That's incorrect. The very basis of this case is that that's not what regents promised the subscribers in their contracts. But that's the argument. That is the argument. That is the reason, the asserted reason, why plan providers, preferred providers, have got an interest that needs to be at the table. You may be perfectly right on your interpretation of the contract, or you may not. But don't they have a right to be at the table when that decision is made? Absolutely not, Your Honor. That's a bootstrap argument. The subscriber agreement governs everything by Washington law and under the practitioner agreement. They agree in the contract, in accordance with Washington law, that the subscriber agreement determines everything. And so if the subscriber agreement has certain provisions, then those are incorporated into the practitioner agreement and how things are supposed to be done. The practitioners don't get to bootstrap an interest on a contract to which they're not a party to then say, well, we have a place at the table here because even though we don't have any interest in this contract and we're independent contractors with regents, we have something to say about the interpretation of this contract. The interpretation of the contract is between the regents and the subscriber. But don't the providers have a financial interest? No. It's not substantial. The Kachel case points out that the interest here has to be real and substantial. And we're talking about an average of $35. And it's speculative what provider will have a patient that will exhaust his or her benefits that year and actually be affected by this. And $35, that's not substantial to a doctor or a dentist. That's a greens fee. Isn't there a financial interest between the allotted amount and what they could otherwise charge? That is the financial interest, Your Honor. Yes, that's correct. It's just not substantial. Do you have any other arguments besides that one? I would point out also that the – You mean on that particular issue? No, I mean on any other issue. Well, I point out that even if this – I mean, let's go to the issue about whether you can join or whether there's an adequate remedy if the action were dismissed. Let's talk about that one. It seems to me that your client got the pay through an alternative remedy. Therefore, she got what she needed. No, we got that through this litigation, Your Honor. Well, you got that by going through the process. All of a sudden, you got the adequate remedy. Well, they didn't without filing this lawsuit. As we pointed out, Regents never indemnified, however they want to call it. The Youngs never got their money back until five months after this lawsuit was filed. And the only reason they got their money back was because this lawsuit was filed. So the remedy did not come through the Regents' appeals process. It came through this lawsuit. That really can't be disputed. I guess you are going immediately to whether your damage claim is whether you ought to get it because of lack of standing. I was just saying, I mean, when you get your money and when you don't get your money is another argument to me. The argument that I saw, and I guess that's why I asked you to respond, is that there was a process she went through, and by going through that process, she got some relief. Whether she got it immediately paid or not is not my question. The question was, didn't she get relief? Which, dealing with the second part of that test, whether there's an adequate remedy if the action were dismissed, it seems a little tough for me to say on an abuse of discretion basis that she didn't have a remedy. Well, I'd say the remedy was ineffective if you have to file a lawsuit in federal court. It was filed in state court and removed. If you have to file a lawsuit to actually get that remedy, the administrative remedy is not effective. That's your argument that if, in fact, you have to do something to collect after getting your remedy, then that isn't a remedy? Is that your argument? Their administrative procedures are not sufficient. That's not my question. Is that your argument? Well, that would be something going forward, but for this case the remedies that were available were not sufficient. And he's saying, the trial court is saying that, well, if I dismiss this case, then you wouldn't have an adequate remedy in the future going through this administrative review process. But Regents is going to maintain the same position throughout, and so you have to go to the third level of review, and maybe the IRO agrees with you and maybe they don't. Thank you. I think we've heard your argument and your time has finished. Morning, Your Honors. Cindy Flynn on behalf of Regents Blue Shield. Regents Blue Shield is a not-for-profit company in which they have subscriber contracts for both group plans and individual plans. The group plans are ones you'd get through your employer, and then the individual plans might be for someone who's unemployed or self-employed or otherwise can't get insurance through their employer. Now, both under the group contracts and the individual plan contracts, premiums are paid for a specific benefit level. They can choose whatever benefit level they want based on the premiums that they want to pay. The subscriber then can treat with any doctor. They don't have to treat with a preferred provider. They're entitled to spend their benefits with doctors that are outside of the preferred provider network. If they treat with a preferred provider, however, they're able to maximize the health care that they obtained during the benefit period or during the covered service period because they actually can go to more health care with the reduced rates. Now, in addition to Regents' contract with their subscribers, they contract with preferred providers, some 22,000 hospitals and doctors throughout the state of Washington. And these doctors are, these preferred providers are, they're independent contractors, not employees of Regents. They see other patients outside of the Regents' network. And these preferred providers provide, during the covered benefit period, their services at the negotiated reduced rate, after which time period they are allowed to charge their regular rates that they would charge to any other patient because they're under a loan. So I think that is, in a way, makes the argument that the subscriber contract is the real issue. It trumps anything in the provider agreement. I don't know whether you agree with that or not, but I'd like to hear your views on it. Well, I don't necessarily agree with that, Your Honor, but there's a tripartite arrangement here. I mean, these contracts are all interactive. There is a relationship. Well, they're not negotiated. I mean, you'd agree with that. I can't call up Blue Shield and say, you know, I don't like Paragraph 15 of your policy. I just go to somebody else. That's true, Your Honor. So, okay, and I assume the same thing. I'm not a doctor, so I don't know how they do it, but I assume the same thing is true. They don't negotiate Paragraph 12 either. No, Your Honor. They just got this agreement. And as I read the agreement, it allows no or maybe just that much wiggle room for the provider. I mean, everything is done by Regents Blue Shield, isn't it? Well, it's not executive, Your Honor. These are not contacts of adhesions with the preferred providers. They negotiate what the reimbursement rate will be and what this contracted rate will be during the benefit period. It's not the same for every doctor. That reimbursement rate is negotiated. It is not a contracted rate. The allowed rate is a negotiated rate. Depending on that individual provider. Now, some of them have the same, obviously. I mean, there might be an obstetrician might have a different rate than a surgeon that can command a higher amount that would be for a specific type of surgery. I mean, each of the providers are not locked into X percentage. Now, they negotiate that with Regents. And a heart surgeon may command a higher reimbursement rate than an obstetrician or a pediatrician might be able to negotiate with Regents. So in addition to these contracts that Regents has, they have these separate arrangements with their providers. Now, the Youngs had both a group contract. And an individual contract. Am I correct that the group contract is not before us at this point? That is correct, Your Honor. Okay. So the only thing that's before us is the individual plan to the extent of injunctive relief. The only thing with regards to the group contract. So far as the district court's decision is concerned. That is correct. The plaintiffs did not bring it on appeal. They did not appeal the issue with regards to whether or not it was appropriate for Judge Lasnik to dismiss the group plans for classification. I'm just saying that's not before us. So all we've got is the individual plan for injunctive relief. Correct. The only way the group plan comes in, Your Honor. So far as the district court is concerned. But we do have the damages aspect of the individual plan before us so far as standing is concerned. Is that right? That is correct, Your Honor. Do we have to reach the issue of standing so far as the damages aspect of the individual plan is concerned if, underlined if, we were to agree that Rule 19 does apply as the district court found? You don't have to reach lack of standing, Your Honor. And here's the reason why. Rule 19 is dispositive. It dismisses all claims. So if the court upholds Judge Lasnik. Well, it does. But, of course, the district court didn't consider the application of Rule 19 to the damages aspect because it dismissed that on standing grounds. That is correct. Procedurally, the lack of standing issue was taken up first, and that was in September of 2008. Then the class certification in March of 2009, and then finally in June of 2009, the Rule 19. Well, that's right. And it isn't crystal clear to me that a Rule 19 ruling, even if in your favor, would dispose of the damages aspect as well. Well, Your Honor, it would in this sense. If the courts, if the court had not heard the lack of standing before it heard class certification. I don't care about the order. I mean, I've got this whole blob up here now, and we have to decide what to do with it. Well, lack of standing with regards to preferred providers would affect both the group and the individual claims. It would be dispositive because it requires the preferred providers to be in the lawsuit. And as you recall, all that went forward on the individual plans was for injunctive relief, not for damages. Well, that's what I keep saying. The damages aspect of the individual plan was disposed of by the district court on the ground of standing. Yes. So I ask you whether we have to decide whether the standing decision was correct or not. Or alternately, if we were to agree with you on Rule 19, would that dispose of the damages claim as well as the injunctive claim? And I believe that would. And I think you said yes. Yes. And I said I'm not sure I understand that. Because it's not crystal clear to me that the claim for damages would be subject to the same Rule 19 analysis on the ability to join the plan providers. Well, Your Honor, and the reason I was talking procedurally of how things came, if at the time that the court looked at class certification issue, they would still have had the damages portion of their individual claim, the entire case would have been dismissed. The only reason they were able to go forward was because without the requirement, and the Court may recall that the reason they dismissed on class certifications is because the damages were not provable. The damages were not provable within the class certification standards. So if that had still been, if they had not decided the lack of standing on damages first on the individual claims, and they had been there at the time the court decided class certification, the whole case would have been dismissed. Well, do I understand it, then, if you have to reach standing that the basis, the best argument that you've got is that you've got two entries in your computer for June whatever it was, for May 10th when a check was issued and June 29th, 07. And there is no declaration authenticating that computer record or even saying that it is a, actually was maintained in the ordinary course of business. Have I got that right? You're wrong. Your Honor, those entries were attached to the declaration of Ms. Rao, and that was ---- Okay. So does Rao authenticate, I mean, does she say that those were records maintained in the ordinary course of business? Maybe I just missed it. I mean, I no doubt did. Your Honor, she says that these are the records that she obtained, you know, she is in-house at Regents, and that these are the records that she obtained from the in-house computer, and there was quite a bit of testimony through depositions that these were records that were maintained in the course of business. So if I read all the depositions, I would find sufficient foundation? Yes, Your Honor, and the Court actually found that to be, that was the Court's holding, that these were records maintained in the course of, ordinary course of business. And Judge Lasting put that directly in his order. Did Your Honor want me to now move to specifically with regards to the lack of standing issue? It's up to you. Okay. With regards to the lack of standing, and again, I don't think you have to reach that since Rule 19 is positive, but if you were to look at the lack of standing matter, standard of review, although for lack of standing is de novo, the underlying factual findings are reviewed with regards to clear error. And that's fairly significant here. Clearly erroneous standard demands significant deference to Judge Lasting's findings. And so that is a very high standard, which the plaintiffs are not able to meet on their appeal here. The Court found that the plaintiffs could not show that they had suffered an injury before they filed suit, which there, of course, eliminated one of the required elements for standing, which is that they have damages before they filed suit. The judge went through the analysis of what documents were available, that they were business records, that it showed that the check had been sent. Now, in response to that, in a motion for reconsideration, which of course should be disfavored under Local Rule 7H, the plaintiffs said that the Court had erred in applying this mailbox rule, but the Court was very articulate in the response in the order in denying that motion for reconsideration, in which they said the Courts do not err in applying applicable law, even if the parties didn't address it themselves. Just because the Court said that, you know, just because no one had pointed it out, the Court certainly was able to apply the mailbox rule. And that presumption, the presumption then is that Dr. Greenfield had received payments. Plaintiffs never rebutted that. They never got any sort of declaration from Dr. Greenfield. And the Court was satisfied that they had, even if he had entertained that issue in the motion for reconsideration, that he says, the Court says that it was insufficiently rebutted by the plaintiffs. And because they didn't have their damages, they therefore lacked the standing. So, Judge, you know, this Court, upon reviewing Judge Lasnik's Court's findings, has to find clearly erroneous in order for plaintiffs to prevail, and they can't prove that. If there's no other questions from the panel, I'll sit down. None. Thank you. All right. Thank you very much. This case is then submitted. Young v. Blue Shield. Case? No. You are already finished. Case 09-36025 is here submitted.
judges: Cebull, Rymer, Smith N. R.